UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA

v.

JEREMY LEROY HELLER,

Defendant

Criminal No. 1:13-cr-383-2

Hon. Liam O'Grady

**GOVERNMENT'S RESPONSE TO DEFENDANT HELLER'S
MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS**

Defendant Heller asks the Court to suppress all incriminating statements, claiming that law enforcement officers interviewing him at work violated his *Miranda* rights[1] and that the statements were otherwise involuntary because Target employees (of a private store) asked him to the interview office. Dkt. Nos. 172, 292. His motion fails because:

- The defendant was interviewed at his work place, informed that he was not under arrest, that his participation was voluntary, and that he was free to leave. And he did leave.

- The defendant was never restrained during his minutes-long interview by two FBI agents carrying no visible weapons; he was never threatened or forced, and no promises were made.

- Agents immediately stopped the interview once the defendant invoked his right to counsel.

- The totality of the circumstances surrounding the interview clearly support a finding that the interview was non-custodial and free from any coercion that would overbear the defendant's will.

---

[1] Although at oral argument on June 6, 2014 on this motion, the defendant seemed to abandon his *Miranda* claim (June 6 Tr. 45; *also see* Dkt. 172 at 4), he now appears to re-assert it (Dkt. 292 at 5).

Under these facts, the defendant was not in custody, and no *Miranda* warnings were required. His statements were otherwise voluntary, and his motion should be denied.

## I.    <u>Factual Background</u>

This Court received evidence on the defendant's motion to suppress on May 2, 2014 and June 6, 2014.  That evidence consisted of the testimony of FBI Special Agent Michael Nail, that of the defendant, Jeremy Heller, three recent photos of the office at Target (in which the statements in question were made with modifications by the defendant which indicate the positions of the chairs within that office on the date of the interview) (Defendant's Exhibits 1-3), and a copy of Agent Nail's FBI report. (Government Exhibit JH-1).

On January 27, 2011, the FBI executed a search warrant at the defendant's home.  (May 2 Tr. 63).  Upon entering, the searching agents found no occupants at home, even though they had expected to find the defendant and at least one roommate.  (May 2 Tr. 63-64).   During the search, agents discovered items suggesting that the defendant worked at a nearby Target store.  (May 2 Tr. 63-64). Agents called that store to confirm that the defendant was currently working and Agents Nail and Heise drove there to attempt to interview the defendant.  (May 2 Tr. 64-65).

### The Defendant's Interview

Upon arriving, the agents sought out a manager.  (May 2 Tr. 65).   They identified themselves as FBI agents and indicated that they wished to speak to the

defendant.   (May 2 Tr. 65).  The manager was not told why.  (May 2 Tr. 65).  After a brief discussion with the manager, it was decided that to avoid disruption on the sales floor, the manager offered to go get the defendant and bring him to the manager's office where the agents could interview him in private.  (May 2 Tr. 65; June 6 Tr. 5-6).  When the defendant arrived at the manager's office, the agents identified themselves as FBI agents.  (May 2 Tr. 68-69).  The agents were dressed in street clothes and had no weapons visible nor any external markings indicating that they were federal agents.  (May 2 Tr. 66).  The agents informed the defendant that the FBI searched his house and were investigating the Anonymous group.  (May 2 Tr. 68; June 6 Tr. 9-10, 11-12, 13).  The defendant was told that the agents were not there to arrest him, but that they would like to talk to him if he was willing and he did not have to talk to them but rather he was free to leave at any time.  (May 2 Tr. 68).  The three men took seats in the manager's office with the defendant seated closest to the door facing the two agents.  (May 2 Tr. 69).

The defendant provided personal identifying information such as his name, social security number, date of birth and address.  (May 2 Tr. 70-71; June 6 Tr. 9).  The defendant explained that he moved from Pine City, Minnesota to Takoma Park, Maryland to obtain a job.  (May 2 Tr. 71; June 6 Tr. 9).

The defendant denied knowing anything about Anonymous but admitted that he did access the 4chan forum where everyone is anonymous. (May 2 Tr. 70).

The defendant admitted to using the online moniker, jeremyhfht, for his gaming web site profiles.  (May 2 Tr. 70).  When questioned about his participation

in IRC channels used by Anonymous, the defendant stated he would only observe the activity and not participate in it.  (May 2 Tr. 71).  When Agent Nail confronted the defendant about his involvement in the DDoS attacks by Anonymous with an IRC transcript, the defendant denied his involvement in the Anonymous attacks and then invoked his right to counsel. (May 2 Tr. 71; June 6 Tr. 35-36).  The brief interview of approximately 4-5 minutes (May 2 Tr. 72) was then terminated promptly by the agents (May 2 Tr. 71), and the defendant left the room (May 2 Tr. 71; June 6 Tr. 40).  The agents left the room a few minutes later (May 2 Tr. 71).  The defendant presumably returned to the sales floor.

## II.   <u>Legal Argument</u>

Under Supreme Court law, the wholesale suppression of relevant evidence is heavily disfavored.  "Suppression of evidence. . . has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (exclusionary rule generates substantial social costs, including "setting the guilty free and the dangerous at large.").  The Supreme Court has rejected, in other words, the "[i]ndiscriminate application" of the exclusionary rule, and holding it applicable only "where its deterrence benefits outweigh its 'substantial social costs.'" *United States v. Leon*, 468 U.S. 897 (1984); *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357 (1998).  Neither the facts nor the law support the defendant's broad request for suppression of his statements and the Court should deny his Motion.

### A.    *Miranda* Warnings Were Not Required Because the Defendant was Not in Custody

To guard against unfair physical and psychological coercion by police, under *Miranda v. Arizona*, 384 U.S. 436 (1966), warnings are required only when both the defendant is in custody and he is being interrogated. *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993).  Noncustodial interrogations do not demand them. *United States v. Pelton*, 835 F.2d 1067, 1072 (4th Cir. 1987); *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (law enforcement officers do not have to "administer *Miranda* warnings to everyone whom they question").  Custody does not have to be formal; its functional equivalent is enough. *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001).  An individual is "in custody" when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). Courts consider whether, objectively speaking, "a reasonable man in the suspect's position would have understood his situation" to be custodial, *id.* at 442; *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010), keeping in mind that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495.

Here, numerous facts about the encounter show that the interview was non-custodial: the interview took place at the defendant's work place; the defendant was not handcuffed or touched; he was told he was not under arrest and was free to

leave; the defendant had unobstructed access to the exit; he was told the interview
was voluntary; no guns were drawn nor displayed; the tone of the interview was
even; and the defendant ended the interview himself by asserting his right to a
lawyer.

It is especially noteworthy here, that the defendant was told that he was not
under arrest and was free to leave.  The Fourth Circuit has held that this
combination of telling a defendant *both* that he is not under arrest *and*
affirmatively that he is free to leave is particularly effective. *Hargrove*, 625 F.3d at
179-80 (finding interview non-custodial where defendant told he was "not under
arrest *and* that he was free to leave" (emphasis original) and noting that "although
advising someone that he or she is not under arrest mitigates an interview's
custodial nature, 'an explicit assertion that the person may end the encounter is
stronger medicine") (citing *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir.
2006)).  *Indeed, the defendant exercised his right to leave by walking out of the office
and leaving the agents behind.*  Agents also told the defendant that he did not have
to answer their questions.  No threats were made; the tone was calm throughout. At
no point in the interview did agents force an answer to any of their questions.  The
fact that the defendant ended the interview and left the room shows that the agents'
words were not just rote procedural language but rather guided the course of the
interview.

In addition, the interview took place at the defendant's work place.  On
familiar turf, the potential for psychological or physical coercion was greatly

diminished.  As the Supreme Court explained, an important factor underlying *Miranda* was the interrogator's goal of "isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner.'" *Beckwith v. United States*, 425 U.S. 341, 346 n.7 (1976).  That simply did not happen here where the defendant was questioned in the familiar surroundings of his work place.  *See United States v. Braxton*, 112 F.3d 777, 783 (4th Cir. 1997) (defendant not in custody because he consented to interview "on his turf"); *Parker*, 262 F.3d at 419 (*Miranda* warnings not required because defendant questioned in own bedroom and was not handcuffed); *see also United States v. Panak*, 552 F.3d 462, 465-68 (6th Cir. 2009) (when interview occurs at either the defendant's residence or work place, it will not "often" require *Miranda* warnings); *United States v. McCarty*, 475 F.3d 39, 46 (1st Cir. 2007) (*Miranda* warnings not required because defendant questioned in his apartment); *United States v. White*, 270 F.3d 356, 366 (6th Cir. 2001) (same).

This interview does not have the same characteristics that are often present during interviews conducted at search scenes which, despite those characteristics, have been found to be non-custodial.  *See Hargrove*, 625 F.3d at 179 (finding interview non-custodial even though "[t]he record does show that some of the officers were armed upon entry of Hargrove's home, directed the occupant's actions during the initial safety sweep of the residence, and conducted a safety pat down of Hargrove.).  *See also United States v. Photogrammetric Data Servs.*, 259 F.3d 229, 239 (4th Cir. 2001) (citing *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981))");

*United States v. Seni*, 662 F.2d 277 (4th Cir. 1981) (under totality of circumstances, drawing a gun and placing the defendant in handcuffs does not by itself render a statement involuntary); *United States v. McCarty*, 475 F.3d 39, 46 (1st Cir. 2007) (no custody during execution of search warrant because defendant not restrained and told he was not under arrest, not obligated to answer questions, and free to leave at any time).

The defendant seems to argue that the fact that the interview was conducted in the defendant's work place made the interview custodial and therefore requiring *Miranda* warnings. This just is not the case. In *United States v. Mahan*, 190 F.3d 416 (6th Cir. 1999), Mahan was interviewed by federal and local agents at his place of employment (Mattel Toy factory) concerning a civil rights investigation occurring outside his work place. Mahan was interviewed in an unlocked room, was never told he was not free to go, sat in the chair closest to the door, was not threatened with arrest, was interviewed for an hour and a half, and at the end of the interview he returned to work. *Mahan*, 190 F.3d at 420. The Sixth Circuit found that those circumstances would not lead a reasonable person to believe that he was under arrest so no *Miranda* warnings were required. *Id*. at 421-22. Equally, in *United States v. Crossley*, 224 F.3d 847 (6th Cir. 2000), the Sixth Circuit found an interview to be non-custodial where military commander ordered defendant to a classroom where she was interviewed by the FBI. *Id*. at 862. Here, the circumstances are very similar to those in *Mahan* and *Crossley*. The defendant was only interviewed for about 4-5 minutes, he was told he was free to leave and did not have to speak to

the agents, and the defendant exercised that right.  In *United States v. Chalan*, 812

F.2d 1302 (10th Cir. 1987), Chalan, a Native American, claimed that his attendance

at a police interview was compelled because, by tribal custom, he could not refuse a

request by the Pueblo Governor to come to his office and was required to remain

until dismissed.  *Id.* at 1307.  Chalan further presented evidence that obedience to

the Governor is expected of all tribal members and a tribal member would be

expected to appear when summoned by the Governor and to answer any questions

asked by the Governor, both of which occurred in his case.  The Tenth Circuit found

that Chalan's desire not to show disrespect toward the Governor did not render the

questioning custodial.  *Id.*  Whatever his subjective beliefs may be, no suppression is

warranted.

Here, the defendant seems to assert that the Target environment became the

functional equivalent of custody.  See Dkt. No. 292, at 4. However, the record is

devoid of any conduct *by the FBI* which would have allowed a reasonable person to

believe that they were in custody.[2]  To the contrary, under the totality of the

---

[2] The defendant testified that he believed that he was in Target's custody when
accompanied to the office in which the interview took place.  (June 6 Tr. 38).
However, despite the defendant's denials to the contrary, the FBI identified
themselves as FBI once he arrived at the office and informed the defendant that
they wanted to speak to him about an investigation into Anonymous, told him his
house was just searched, that he was free to leave, that he was not under arrest,
and that speaking to them was voluntary. (May 2 Tr. 68; June 6 Tr. 9-10).  Any
subjective belief that the defendant was in custody would have then been removed
at that point, and clearly it would not be objectively reasonable for the defendant to
believe that he was in custody. "Subsequent testimony by an accused about his prior
subjective mental impressions and reactions must be carefully scrutinized, 'as such
testimony is always influenced by [his] self-interest.'"  *Braxton*, 112 F.3d at 781,
*quoting United States v. Wertz*, 625 F.2d 1128, 1136 (4th Cir.1980).

circumstances presented by the facts in this case, a reasonable person who is confronted at his work place by the FBI, told that speaking to them was voluntary, that they were free to leave, and that they were not under arrest, could not reasonably believe that they were in custody – especially when this person *actually exercised that right and walked out.*

The defendant further argues (without citing any evidence) that the FBI, by having the defendant's manager retrieve him from the sales floor, made the manager an "instrument" or "agent of the state" and the circumstances became such that the interview was custodial.  Dkt. 172 at 3.  The only case that the defendant cites to for this proposition is *United States v. Feffer*, 831 F.2d 734 (7th Cir.1987). *Feffer's* instructional value here is limited. That case involved a private search, and not an interview, and is inapplicable here.  In *Feffer* the Court was applying Fourth Amendment principles, not those of the Fifth Amendment.  Even if the principles in *Feffer* were applicable here, the instant case is factually distinguishable. Additionally, to prove that the manager was acting as the government's agent and somehow facilitating a non-custodial environment, more than mere knowledge and passive acquiescence by the government is required.  *United States v. Jarrett*, 338 F.3d 339, 345 (4th Cir. 2003).  Clearly no such agency relationship existed here.[3] Even if an agency relationship were found to exist, the interview still would be non-custodial for the reasons stated above.

---

[3] The burden of proving an agency relationship between the government and a private party is on the defendant.  *United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003) (citations omitted).  Other than speculating, the defendant has not established agency in this case.

**B.      The Defendant's Statements were Otherwise Voluntary**

The government must prove that a statement is voluntary by a preponderance of the evidence.  *Lego v. Twomey*, 404 U.S. 477, 484 (1972); *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir.1997).  A statement is involuntary under the Fifth Amendment only if it is "involuntary" within the meaning of the Due Process Clause.  *Oregon v. Elstad*, 470 U.S. 298, 304 (1985).  The proper inquiry for determining whether a statement is voluntary under the Due Process Clause "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *Braxton*, 112 F.3d at 780.  It is important to note, especially given the facts in this case, that the Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Finally, to determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider "the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Pelton*, 835 F.2d at 1071 (*quoting United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980).

The totality of the circumstances in this case includes a defendant that appears to be intelligent and well-informed of his Constitutional rights. They also include an interview by the FBI which was routine, benign, and non-coercive for all of the reasons that have been discussed above; as well as being notable for the absence of any threats or promises of any kind and its brevity. (May 2 Tr. 72-73). The setting of the interview was familiar to the defendant and lacked any indicia of a coercive environment as evidenced by Defendant's Exhibits 1-3. However, it is the setting that the defendant argues caused his will to be overborne or capacity for self-determination to be critically impaired. The only support for the defendant's contention that the setting of the interview at the manager's office in the Target store as being coercive comes from the defendant.[4] The defendant cannot credibly claim to have been coerced *when he asserted his right to an attorney and then within minutes walked out of the office, leaving the agents behind.* In addition, the defendant must rely on three things to make this claim of a coercive environment at Target even plausible.

First, the defendant needs to support a claim that the FBI knowingly used or leveraged this alleged coercive environment. The defendant has repeatedly argued that "by using the management of Target and their Asset Protection personnel…the government accomplished something it otherwise could not do." Dkt. 292 at 3. This

---

[4] The defendant in his post-hearing memorandum cites to an online personnel manual for TargetCW in an attempt to provide support for some of the defendant's testimony. *See* Dkt. 292 at 3, n. 1. However, TargetCW is not the same as Target the chain of stores, but rather a contingent workforce company out of California. As such, this manual is not relevant and provides no support for the defendant's testimony.

claim is not supported by the testimony that was adduced at the hearing.  The facts as based on the testimony are that the FBI went to Target to interview the defendant when he was not found at his house when they executed a search warrant.  (May 2 Tr. 64-65).  That upon arriving at Target, the FBI spoke to a manager and it was decided so as to not disrupt the business of the store that the manager's office would be used for the interview *at the manager's suggestion*.  (May 2 Tr. 65; June 6 Tr. 5-6).  That the FBI was unaware of exactly whose office it was other than being a manager's office.  (June 6 Tr. 6).  And that the Target manager was not told by the FBI why the FBI wanted to speak with the Defendant.  (May 2 Tr. 65).  The record is devoid of any facts that would support a claim that the FBI knowingly used or leveraged Target in any way to produce a coercive environment. As stated earlier, the defendant fails to establish an agency relationship between the Target personnel and the FBI to accomplish the same.  Without this evidence, there is no evidence to support the necessary predicate finding that "coercive police activity" led to an involuntary statement.  *See Colorado v. Connelly*, *supra*.

Second, whatever his subjective beliefs may be as a defendant seeking to suppress his statements, he has failed to support his claim that the defendant was compelled by Target policy to speak to the FBI or he would be fired.  There is absolutely no evidence in this record that the defendant faced termination from Target if failed to speak to the FBI or even Target employees for that matter.  The defendant did not testify about any consequences of a failure to cooperate.  In this regard, his own attorney offered him at least two opportunities to say that the

interview was involuntary.  (June 6 Tr. 21).[5]  The fact that the defendant asked R.

AP if the interview was optional would appear to support the opposite conclusion,

namely, that Target policy does not make cooperation a condition of employment.

   Third, the defendant wants desperately for this Court to believe that he was

never told that the interviewers were FBI agents and further was never told the

reason for the interview until after he invoked at the end of the interview.  The

defendant's testimony is inconsistent and hence not credible on these points.  The

defendant testified both that the FBI never identified themselves as such but rather

he guessed that they were FBI after a "minute of conversation" (June 6 Tr. 42), and

that he knew they were FBI when they told him.[6]  More important to the

---

[5] **Mr. Watson**:  Okay. At that point did you have any question about whether or not
this was optional?

**Defendant**: I didn't ask a question immediately. What happened was
they asked me to close the door as I walked in and have a seat.

**\*\*\*\*\*\***

**Mr. Watson**:  On the way to the office and up to being delivered to the office, are
you having -- do you have any indication that this is an optional thing for you to do?

**Defendant**: No. When I did ask, and he [R. AP] gave me that, you know,
typical response he gives when you ask him something he is not going to answer, it
was the did you do anything wrong, after that he was nonresponsive to any
questions, really.  I had no idea what it was. So I assumed it was another Target AP
issue. Which got me nervous.

[6] **Mr. Green**:  Now, is it your testimony that it's only then at the end when you
asked for a lawyer that they told you that they were FBI, is that your testimony?

**Defendant**:  The thing is that they never really said, you know, hey, we're FBI
agents, you know, explicitly. Like I said, I figured it out once they asked me -- once
they asked me about my moniker and the IRC chats, it became pretty clear what

defendant's argument, is his testimony that he was never informed by the FBI as to why they were interviewing him. This point is crucial for the defendant. If the defendant was informed as to the nature of the interview, by his own admission, any coercive influences from Target that he is alleging disappear.[7] The defendant's testimony on when he was informed about the nature of the interview is in direct conflict with Agent Nail's testimony. However, the defendant's testimony in this regard is replete with inconsistencies. He reports the sequence of questioning differently at various points. In contrast, Agent Nail's testimony is consistent on this point despite numerous attempts by the defense to move him off this point.[8]

---

they would have to be after. So -- they never told me explicitly. I sort of figured it out.

(June 6 Tr. 41)

*****

**Mr. Green**: You knew they were the FBI?

**Defendant**: After they told me, yes.   (June 6 Tr. 37)

[7] **Mr. Watson**: Okay. And at the point that Anonymous comes up and you assert, prior to that point did you have any reason to believe that the reason you were there had nothing to do with Target?

**Defendant**: I didn't have any other reason to believe, no. When they mentioned the other group, that's when I realized, yeah, this couldn't possibly have anything to do with Target, and stopped from there.

(June 6 Tr. 43)

[8] **Mr. Watson**: All right. Did you notify Mr. Heller at that point that a search warrant had been served on his house?

**Agent Nail**: We actually notified Mr. Heller of this in the beginning of the actual, you know, the interview. And we advised him that he didn't have to actually speak

The defense repeatedly argues that Agent Nail's testimony is inconsistent with his summary report of the interview.  *See* Government Exhibit JH-1.  The summary report tracks with consistency Agent Nail's testimony as to the order of each of the topics of the questioning.  What the summary report does not include is what Agent Nail told the defendant at the outset of the interview.  However, this omission does not serve to detract from the otherwise consistent testimony of Agent Nail.  It is the defendant's testimony that should be viewed with caution in this regard.  Not only does the proffered testimony by the defendant offer internal inconsistencies, but it

---

with us or anything, but, you know, we just needed to actually speak with him about this investigation.

**Mr. Watson**:  Okay. And by this investigation, were you referring to the search warrant having been served at his house?

**Agent Nail**:  Yes.

**Mr. Watson**:  At that point, at the outset of your conversation with Mr. Heller, did you tell Mr. Heller that you were there investigating something having to do with Anonymous?

**Agent Nail**:  Yes, I did.

(June 6 Tr. 9-10)

**\*\*\*\*\*\*\***

**Mr. Watson**:  Okay. So the first time the question about Anonymous or online activity came up was after all the discussions about his background data and why he came to Maryland and so on?

**Agent Nail**:  Like I said, we advised Mr. Heller that we were searching his residence in reference to the FBI's investigation into the Anonymous group. I told him that from the beginning. So –

(June 6 Tr. 11-12)

also stretches the bounds of reason why FBI agents would fail to identify themselves as such after identifying themselves as FBI agents to the manager, and also fail to inform the defendant about the nature of the interview and the search of the defendant's house until after the defendant invokes and the interview is over.

Given the lack of evidentiary support for the proposition that the FBI knowingly participated in creating a coercive environment, the benign nature of the interview itself, no support to find that Target policies threatened the defendant's employment if he did not speak to the agents, and no credible support that the defendant reasonably believed that the interview was related to Target and not Anonymous, all of the circumstances of the interview conspire to support a finding that the statement was voluntary because his will was neither overborne, nor his capacity for self-determination critically impaired.

### *Garrity v. New Jersey*

The defendant relies on the *Garrity* line of cases for support in his effort to suppress his statements as involuntary. *Garrity v. New Jersey*, 385 U.S. 493 (1967). "When an individual is compelled to give testimony to his public employer, and thus waive s his Fifth Amendment protections, any statements given in the course of the compelled interview cannot be used in a future prosecution." *United States v. Holland*, 417 Fed.Appx. 359, 360 (4th Cir. 2011) (unpublished), *Garrity*, 385 U.S. at 500. The defendant's reliance on *Garrity* is misplaced. First, the compulsion in the *Garrity* line of cases is the threatened loss of ***public*** employment – it must be a government actor (not a private company) that is acting in a coercive manner –

suppression exists to deter inappropriate government action, after all. Here, as stated above, the defendant was never told he would lose his job at Target if he failed to speak with the agents. *See United States v. Cooper*, 269 Fed.Appx. 253, 254 (4th Cir. 2008) (unpublished) ("In contrast to the situation in *Garrity*, there was no evidence that Cooper was told that if he did not cooperate by answering the questions of postal inspectors, he would be fired."). Second, the potential loss of employment must be public employment. *See United States v. Cooper, supra.* Here, the defendant cannot claim that even if his job were threatened, that it was public employment.

There is at least one Circuit that has extended the *Garrity* rule to private sector jobs. In *Sanney v. Montanye,* 500 F.2d 411 (2d Cir. 1974), the Second Circuit found that a person who was given the choice of making a statement or losing their private job could be protected from the use of that statement in a subsequent criminal proceeding. However, even in this Second Circuit case, the requirement of government action was a condition precedent for application of *Garrity*. *See United States v. Solomon*, 509 F.2d 863, 871 (2d Cir. 1975) ("In *Garrity* there was clearly government action. Similarly, the Sanney court found that the private employer was 'admittedly acting as an agent for the police.'"); *see also United States v. Vangates*, 287 F.3d 1315 (11th Cir. 2002). Here, as stated earlier, there is no evidence to support a claim that Target was acting as the agent of the FBI. For all of the above reasons, the defendant's claim under *Garrity* also fails.

III.     **Conclusion**

The defendant's motion to suppress statements lacks total support in the facts and the law.  The defendant urges this Court to find that the defendant was effectively in custody when he was questioned by the FBI at Target, or that the FBI somehow used Target employees to create an atmosphere in which the defendant's will was overborne.  Whatever his subjective beliefs may now be, trying to suppress his statement, the evidence in this case suggests that the defendant was well aware of the purpose of the interview from the beginning and that the defendant chose to terminate the interview when confronted with an IRC chat log which confirmed his involvement in the illegal activities of Anonymous – ***and walked out***.  The interview was benign in all respects.  The defendant was informed that he was not under arrest, that his participation in the interview was voluntary, and that he was free to leave.  And the interview was conducted in the familiar environment of his work place.  In addition, he was not handcuffed or otherwise touched during his interview.  Most importantly, the interview was very brief and was terminated by

the defendant when he invoked his right to counsel, leaving the room of his own free

will at the end.  His motion should be denied.


                              Respectfully submitted,

                              Dana J. Boente
                              United States Attorney


                    By: _____/s/_____
                              Alexander T.H. Nguyen
                              Jay V. Prabhu
                              Assistant U.S. Attorneys
                              U.S. Attorney's Office
                                    Eastern District of Virginia
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                              Phone: (703) 299-3700
                              Fax: (703) 299-3980
                              Email: alexander.nguyen@usdoj.gov
                              Email: jay.prabhu@usdoj.gov

                              Richard D. Green
                              Senior Trial Attorney, U.S. Department of Justice
                              Computer Crime & Intellectual Property Section

Date: June 27, 2014

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2014, I electronically filed the foregoing

GOVERNMENT'S RESPONSE TO DEFENDANT HELLER'S MEMORANDUM IN

SUPPORT OF MOTION TO SUPPRESS STATEMENTS with the Clerk of Court

using the CM/ECF system, which will send a notification of that electronic filling

(NEF), and I have also served by email a copy of the foregoing to the following:

John C. Kiyonaga
john@johnckiyonaga.com

William Todd Watson
todd_watson@fd.org

Marina Medvin
marina@medvinlaw.com

John O. Iweanoge, II
joi@iweanogesfirm.com

James W. Hundley
jhundley@bhnklaw.com

Elita C. Amato
amato@amatoatlaw.com

William Loeffler
williamodouglas@aol.com

Drewry B. Hutcheson, Jr.
hutch365@msn.com

Gregory B. English
gbeuva@gmail.com

Jessica Nicole Carmichael
jcarmichael@pnalaw.com

Gretchen Lynch Taylor
gretchen@taylorlawco.com

Gary H. Smith
smithgh58@aol.com

John Louis Machado
johnmachadoesq@kreative.net

Joseph Abrenio
joseph.abrenio@leclairryan.com

Respectfully submitted,

Dana J. Boente
United States Attorney

By: _____/s/_____
    Alexander T.H. Nguyen
    Jay V. Prabhu
    Assistant U.S. Attorneys
    U.S. Attorney's Office
    Eastern District of Virginia
    2100 Jamieson Avenue
    Alexandria, VA 22314
    Phone: (703) 299-3700
    Fax: (703) 299-3980
    Email: alexander.nguyen@usdoj.gov
    Email: jay.prabhu@usdoj.gov

    Richard D. Green
    Senior Trial Attorney, U.S. Department of Justice
    Computer Crime & Intellectual Property Section

Date: June 27, 2014